757 F.2d 124
 23 Ed. Law Rep. 871
 BROWN UNIVERSITY IN PROVIDENCE IN the STATE OF RHODE ISLAND
and Providence Plantations, and Wilfred B. Talman,
Plaintiffs-Appellees,
v.
Randal Alan KIRSCH, a/k/a R. Alaine Kirsch, a/k/a Randall
Alaine Kirsch, a/k/a R. Alain Everts, Defendant-Appellant.
 No. 84-1027.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 5, 1984.
Decided March 7, 1985.
As Amended March 8, 1985.
 
 David E. Lasker, Buffett, Dew, Blaney, Olson & Lasker, Madison, Wis., for defendant-appellant.
 John C. Carlson, Lawton & Cates, Madison, Wis., for plaintiffs-appellees.
 Before ESCHBACH and POSNER, Circuit Judges, and WISDOM, Senior Circuit Judge.*
 WISDOM, Senior Circuit Judge.
 
 
 1
 This appeal presents the question whether the district court erred in dismissing defendant Randal Alan Kirsch's counterclaim against Brown University for libel.[1] Brown University published a "Notice to Bookmen" in several prominent bibliographic publications stating, in effect, that Kirsch had solicited or accepted materials in the name of Brown University without Brown's authorization, and that Kirsch had not turned over this material to Brown University. On appeal, Kirsch alleges that the district judge usurped the role of the jury in determining the defamatory meaning of the Notice to Bookmen and that the district court erred in finding there was no genuine issue as to any material fact concerning the truthfulness of the Notice. We find no error in either determination and accordingly affirm.
 
 I. FACTS AND PROCEEDINGS BELOW
 
 2
 Randal Kirsch collects the works, manuscripts, and letters of Howard P. Lovecraft, an early twentieth century author of science fiction and fantasy tales. In June 1968, Kirsch, then a student at U.C.L.A., visited Brown University's John Hay Library, which houses a large collection of materials relating to Mr. Lovecraft. Kirsch proposed that the library pay the rental on a tape recorder and furnish him with tapes to enable him to travel about the country to conduct taped interviews with persons who had known Lovecraft or had corresponded with him. He proposed to donate the tapes to the Lovecraft collection at the Library. The librarians accepted this offer.
 
 
 3
 Kirsch had been in communication with Wilfred B. Talman, who had known Lovecraft from the early 1920's until Lovecraft's death in March 1937. Kirsch had written four letters to Mr. Talman before finally meeting him in July 1968. In the first and second letters, Kirsch asked mainly for documentary information. In the third letter, Kirsch wrote: "I would certainly be grateful for whatever material you may be able to give me regarding yourself and HPL and the Lovecraft Circle Members."
 
 
 4
 After that request for material, Mr. Talman answered that he did indeed have some materials and had recently been sorting through "some Lovecraftiana". Mr. Talman asked, "I trust your desire for information is purely personal, and that you're not counting on me to help with information for a book or something."
 
 
 5
 Kirsch answered, saying that the research was not for a book, "but all goes to Brown University":
 
 
 6
 "My research is not for a book, but all goes to Brown University, who is sponsoring my trip around New England to tape the reminscenses [sic] of those who know HPL."
 
 
 7
 On or about July 13, 1968, Kirsch visited Talman's home in New Jersey and interviewed him there. Near the outset of the taped interview, Mr. Talman again asked about the nature of Kirsch's research:
 
 
 8
 Talman: "Tell me before we start in, or perhaps we are already started, what is the--under what section of Brown University is this being done?"
 
 
 9
 Kirsch: "Well, the special collections department. A Mrs. Hathaway is the head of it, had given me the tapes, the recorder to go and do this material gathering."
 
 
 10
 In a later, unrecorded portion of the visit Talman told Kirsch that he wished to donate some materials to the library at Brown University. Kirsch told Talman that he had no idea when he would return to Brown University, except that he had to return the tape recorder after two months. Kirsch accepted the materials, and hand wrote a receipt which he left with Talman. It read in full:
 
 
 11
 "Saturday, July 13, 1968
 
 
 12
 "Received from Wilfred Blanch Talman, one box of material, including diverse letters from H.P.L. (complete), several MSS, several pulp magazines, several amateur journals, 3 books by Randall Alan Kirsch, on behalf of Brown University."
 
 
 13
 The district court found, and the record supports, that Talman had formed an intention to donate his collection of Lovecraft letters to Brown University several years before Kirsch's visit. Talman later explained why he had given Kirsch the materials: "[S]ince Kirsch represented Brown, he could save me some moving trouble and the trouble of a subsequent donation to Brown myself, if he could readily deliver the Lovecraft letters I felt should eventually go to Brown." Talman also gave some materials to Kirsch that Kirsch was to keep for himself. Kirsch took both his own gifts and the materials intended for Brown when he left. He did not give the materials to Brown despite the University's written request for them.[2] Nor did he return the tapes.
 
 
 14
 Kirsch had also communicated with Sonia Lovecraft Davis, the widow of H.P. Lovecraft. Mrs. Davis intended to donate some or all of her material to the special collections library at Brown. Mrs. Davis later alleged, both in letters to him and to his grandparents, that Kirsch had kept materials intended for the library. The library received a copy of Mrs. Davis's letter to Kirsch's grandparents.
 
 
 15
 Kirsch also obtained Lovecraft materials from Ethel Morrish, another of Lovecraft's relatives. Mrs. Morrish lent Kirsch some photographs, which he promised to return "within ten days of receipt". Over six months later, her grandson, an attorney, wrote Kirsch asking for the return of material. Five weeks later, he again wrote Kirsch requesting immediate return of the Lovecraft material and threatening legal action if the material was not returned by October 15, 1972. On July 19, 1973, Robert Harrall wrote to the attorneys for Brown University indicating that Mrs. Morrish would be willing to join in a suit to retrieve her material.[3]
 
 
 16
 In late July and early August 1973, librarians David Jonah and Stuart Sherman worked with other persons, including an attorney, in drafting a notice to Bookmen. The Notice, in full, read:
 
 
 17
 "The Brown University Library wishes to alert antiquarian booksellers, dealers in manuscript material, collectors and librarians that Mr. R. Alain Kersch, also known as R. Alain Everts, Randal Alan Kirsch and other variations, is known to have solicited in the name of Brown University, letters, manuscripts and possibly printed materials and photographs by and about Howard Phillips Lovecraft (1890-1937), the Providence author of weird and fantastic tales. Such material has been for his own personal use and has not been turned over to Brown University.
 
 
 18
 "We wish to disclaim having at any time authorized Mr. Kirsch to solicit or accept Lovecraft or any other materials in the name of Brown University. We request that persons having information about materials solicited by Mr. Kirsch, alias Everts, in the name of Brown University Library communicate with the Director of Libraries, Brown University, Providence, Rhode Island, 02912, or telephone collect to 401-863-2162."
 
 
 19
 In 1974 Brown filed an action for replevin of certain Lovecraft material that Kirsch had collected. Kirsch removed the action to United States District Court for the Western District of Wisconsin under diversity jurisdiction. Upon removal to the district court, Kirsch filed a counterclaim stating a cause of action for libel against Brown based on the Notice to Bookmen and alleging damages in excess of $10,000. In 1984 the district court entered a judgment for Brown on its original complaint. That judgment was not appealed. On December 3, 1983, the district court adopted the magistrate's findings and granted Brown's motion for summary judgment, dismissing the Kirsch's counterclaim with prejudice. This appeal followed.
 
 II. DISCUSSION
 
 20
 A. The District Court Did Not Usurp the Role of the Jury
 
 
 21
 On appeal, Kirsch argues that the district court erred in not permitting the jury to ascribe a "more derogatory meaning" to the Notice to Bookmen. The district judge acknowledged that a reasonable innuendo was that Kirsch was a "thief, crook, or conversioner" but held that "[t]his goes to the gravity of the possible consequences flowing from the language" rather than being a "reasonable perimeter of implication of the advertisement".[4]
 
 
 22
 In ruling on the motion for summary judgment against the libel claim, the district court outlined two areas in which a genuine issue of material fact could exist: (1) what Brown University stated or implied in its Notice to Bookmen, and (2) whether the statements were substantially true. Although there was no dispute as to the actual language of the Notice, the parties differ on the limits of the words' capability for defamatory meaning. Kirsch argues on appeal that the district court abused its discretion in determining the perimeters of the words' meaning rather than leaving this question for the jury.
 
 
 23
 The district court recognized that "[i]t is for the fact-finder--in this case, a jury--to determine the perimeter broadly or narrowly, thus casting heavily or lightly the burden of persuasion imposed upon the accused libellant to prove substantial truth". The court reasoned, however, that this "perimeter-setting" must be within the bounds of reason as determined by the court. The court then established the interpretation of the Notice that was least favorable to Brown, the moving party, but that was still within the bounds of reason, to rule upon the motion for summary judgment.
 
 
 24
 Kirsch relies on Fitzgerald v. Penthouse International, Ltd., 4 Cir.1981, 639 F.2d 1076, to support his argument that the meaning of a communication is always a jury question. In Fitzgerald, however, the Court held that the publication was capable of both a defamatory and a nondefamatory meaning, and therefore presented a question for a jury. The district court in Fitzgerald, by stating that the article was not defamatory, went beyond its authority to make the determination of whether the statements in the article were capable of being defamatory and resolved the factual issue of whether the statements were actually defamatory. But here the district court has, upon the motion for summary judgment by the alleged libelee, judged the publication by the reasonable light least favorable to the moving party, and so he is not required to submit all possible meanings of the alleged defamation to the jury. As stated in Meier v. Meuer, Wisc.1959, 8 Wis.2d 24, 98 N.W.2d 411, 414:
 
 
 25
 "The duty of the court at this stage is to determine whether the language used is reasonably capable of conveying a defamatory meaning to the ordinary mind and whether the meaning ascribed by plaintiffs is a natural and proper one. 'The words used must be construed in the plain and popular sense in which they would naturally be understood.' "
 
 
 26
 The district judge's reading of the Notice to Bookmen, for purposes of summary judgment, captured all of the reasonable defamatory meanings and inference of the publication. The remaining question is whether the publication, read by this light, was true. The truth of an allegedly defamatory statement is a complete defense. As this Court held in Simonson v. UPI, 7 Cir.1981, 654 F.2d 478, 481, "Under Wisconsin tort law, [a] defamation action cannot succeed unless it is shown that the alleged defamatory statements were both defamatory and false". There are both state and federal cases where courts have taken the course of the district court here, to find the words to be defamatory, then grant summary judgment because there was no material dispute as to the truthfulness of the statements as construed. Lathan v. Journal Co., Wisc.1966, 30 Wis.2d 146, 140 N.W.2d 417, 421-23; Simonson v. UPI, 7 Cir.1981, 654 F.2d 478. We now turn to the issue of genuine disputes over material facts.
 
 
 27
 B. Genuine Issue of Material Fact Regarding the Truth of the Statement
 
 
 28
 It is well established that summary judgment is to be "cautiously invoked to the end that parties may always be afforded a trial where there is a bona fide dispute of facts between them". Associated Press v. United States, 1945, 326 U.S. 1, 6, 65 S.Ct. 1416, 1418, 89 L.Ed. 2013, 2022-23. The court is to determine whether there are issues to be tried; it is not to try disputed issues on the affidavits. Jaroslawicz v. Seedman, 2 Cir.1975, 528 F.2d 727, 731. The burden is on the moving party to establish the absence of any genuine issues of material fact. Rose v. Bridgeport Brass Co., 7 Cir.1973, 487 F.2d 804, 808.
 
 
 29
 The defendant argues on appeal that the plaintiff did not meet this burden to establish the absence of any genuine issue of material fact. Specifically, Kirsch alleges that there was an issue of fact as to whether he solicited materials in the name of Brown University, as to whether he had been authorized by Brown University to make such solicitations, and whether the defendant kept the material for his own use. The statement asserted defensively as true need not be "true in every particular"; all that is required is that the statement be "substantially true". Lathan v. Journal Co., Wisc.1966, 30 Wis.2d 146, 140 N.W.2d 417, 423 (citing Meiur v. Meurer, Wis.1959, 8 Wis.2d 24, 29, 98 N.W.2d 411). Based on the factual propositions set forth in the district court opinion--none of which is clearly erroneous--the trial court is correct in holding that "as of the time of the advertisement, [Kirsch] had solicited materials in the name of Brown University when he had not been authorized to do so, and had kept such materials for his own use." Brown University has therefore presented a complete defense to the libel claim as a matter of law.
 
 III. CONCLUSION
 
 30
 The district court did not err in establishing the outer bounds of reasonable inferences from the Notice to Bookmen. Nor was there any genuine issue of material fact with respect to summary judgment. We have examined Kirsch's other claims, including his allegation that the district court applied an improper legal standard in determining summary judgment, and find them without merit. The order of the district court is accordingly affirmed.
 
 
 
 *
 The Honorable John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, is sitting by designation
 
 
 [1]
 The original claim was Brown University's action for replevin. The district court entered judgment for Brown on its original complaint. Only Kirsch's counterclaim for libel presents issues on this appeal
 
 
 [2]
 On December 4, 1969, David A. Jonah, the director of libraries at Brown, wrote Kirsch for the materials from Mr. Talman:
 "I have recently learned through a letter received at the Library inquiring about Lovecraft material that Wilfred Talman of Upper Saddle, New Jersey had given you the letters which Lovecraft had written to him, with the understanding that they were to be passed on to Brown. To date we have not received them and Mr. Talman is wondering why we have not acknowledged their receipt.
 "Would you kindly forward these to me at your earliest convenience so that I may write to Mr. Talman and tell him that the letters are now at Brown. I did not wish to write to him that you have not turned them over to the Library.
 "May I please have a prompt response."
 
 
 [3]
 There is no allegation here that Kirsch took these materials in the name of Brown
 
 
 [4]
 In so holding, the judge apparently determined that although some people reading the Notice may conclude that the defendant was a thief who should be arrested on sight, this was not a reasonable inference or innuendo
 The district court held:
 "The jury would make its choice between or among the alternative perimeters, and would then proceed to answer whether, within that perimeter, substantial truth was uttered.
 "However, this perimeter-setting, like all jury functions, must be performed within the bounds of reason, and it is the judge who must determine those bounds. There are many cases, of course, in which, until the judge has heard the evidence, she or he is not equipped to circumscribe the jury's role in terms of reasonableness. But when the question is to determine the limits of reasonableness in the effect to be given the words of a document, such as the advertisement in the present case, the judge is as well equipped sooner as later to determine the limits of reasonableness. There are many exceptions to this, when the interpretation of the words of a document can be informed and facilitated by evidence of its setting, such as the use of scientific or commercial terms, but this is not one of them. The Lovecraft materials apparently addressed the occult, but there is nothing exotic about the language of the advertisement in question.
 "I hold that the broadest, yet reasonable capability [sic] of defamatory meaning, and the most extended, yet reasonable perimeter of implication of the advertisement is: that defendant had solicited materials in the name of Brown University when he had not been authorized by Brown University to do so, and that he kept such material for his own use."